turning would please introduce themselves. That would be helpful. Let's start with the defendant. Good afternoon. My name is Nicole Massarello. I'm a s s a r e l l o on behalf of Cordarius Lawrence. Okay, and state's turning. Good afternoon, your honors counsel. My name is David Greenspan. I will be representing the people of state of Illinois in this matter. Okay, you'll see with us today are on this panel are my two colleagues, Justice Michael Hyman and Justice Mary Ellen Coughlin. Our normal procedure in these zoom cases is we try to give everybody you know, both sides 15 minutes, the defense should reserve a couple minutes for rebuttal. We try to give you some time to get out your major thoughts. And we will of course, ask questions and that might expand the time but that's okay. We don't hold that against you. If it's our question. I would like to just remind you, we've read the briefs, we've read the record. And we're pretty familiar with the facts in this case. So my my hope is that you'll both just get directly to the most important start with your most important and best argument and work out from there. And with that, I would like to start with Mr. Massarello. Thank you. May it please the court. I apologize. Nicole Massarello for the appellant for Darius Lawrence. And I would ask to reserve two minutes for rebuttal. Okay. I'm going to focus on the first two issues that I raised in my briefs. I think those are the most important and they're somewhat related. The first being the sufficiency of the evidence. And that is also something that's considered when then we look at the statements made by the prosecutor during closing argument, and whether or not that prejudiced Mr. Lawrence. Regarding the sufficiency of the evidence, it's important to note that Mr. Lawrence, there was no physical evidence that tied Mr. Lawrence to the scene. There were no fingerprints, no DNA, there was no firearm recovered. Additionally, Mr. Lawrence, there's no admissions. The entire case, I would say relies on three circumstantial eyewitnesses. Now, as many times the state says that there are three eyewitnesses to the shooting, there are no witnesses to the shooting. But the witnesses, at least two of them, knew him, correct? Yes. And they identified him as the person who did the shooting. They saw him run, and then they heard shots. Well, they actually, I understood that their actual testimony was they didn't see anything. Their testimony in the grand jury was different than their testimony in court. Their statement to the police was very different. Of course, that wasn't under oath. So what we're trying to figure out is what did they hear? And what did they see? And what did they, about this defendant? Yes. So at trial, both Asia Daly and Akara Chambers, who know Mr. Lawrence, stated that they didn't see anything. What do you mean when you say you didn't see anything? What do you mean by that? They essentially- They didn't see him shoot. Is that what you're referring to? Well, at trial, they said they didn't see anything. And then they were, their grand jury statements and the videotape statements were then presented. And Ms. Daly says that she allegedly saw Mr. Lawrence come out from an alley and shoot at the victim's vehicle and him, which isn't supported by any physical evidence since there was only one area where there were shell casings found. But additionally, she says that then she saw- When you say that, what are you basing that on? The red coat? No, I'm basing that on that there is only one area where there were shell casings found, but Ms. Daly says that there were two sets of shots fired and there's no physical evidence to support that. So she states that he comes out of an alley and is shooting towards the victim in his vehicle, and then that Mr. Williams runs and that she sees Mr. Lawrence chase him. Those are her statements at the grand jury and video. Ms. Chambers says that she sees Mr. Lawrence come out- Doesn't she also say, I mean, there is some testimony about what happens before the victim is pulled out of his car and on the ground surrounded by one or two people. And then I understand what you're saying, that there's a discrepancy about what happens before that, but with respect to the victim being pulled out of the car, and correct me if I'm wrong, pulled out of the car and being surrounded by other people, and then somehow getting away and running, they consistently say that the defendant ran after the victim, the two girls that knew the defendant. Ms. Chambers and Ms. Daly both say that at some point in their videotaped or grand jury statements, yes. And Ms. Chambers says that she- They both came off those statements at the actual substantive evidence. Yes, that's correct. Is that inaccurate? It is also correct that that testimony was five years, four or five years, four years before they testified at trial. Four years is a long time. So they say they didn't remember certain things. That testimony was taken very close to, within a year of the- I believe it was 15 months, approximately 15 months after the incident is when they have their video recorded statement. And then a few months after that, their grand jury statements, I believe it is maybe May and June. So it was well over a year later. And Ms. Chambers says she never saw Mr. Lawrence with a gun. And also at her grand jury statement testimony, she says that the officers refreshed her memory. She says that, and that was evidence at trial. So she says at the grand jury before testifying at trial, that the officers refreshed her memory, which is completely inappropriate. That shows that she was given information. And Ms. Daly says things similar to that as well during the videotaped statement. She goes, well, now I know things such as last names. So she clearly was given information before this, the statements on video and the grand jury 15 months after this occurs. Well, how do you get to that? How do you know it was somebody with law enforcement and not some other way? Ms. Chambers says once, I didn't quite remember, but once the officers refreshed my memory, she says that in her grand jury. And both of Ms. Chambers' statements, she says she never saw Mr. Lawrence with a gun, but she saw him chasing Mr. Williams. And they both said that the police threatened to take away their children. Yes, that was their testimony at trial. So the statements that they made at the police station were not under oath, but they were videotaped. Then the grand jury testimony was under oath. But in both of the cases, they said, oh, now I remember something else. And the testimony in court, of course, was under oath. And that was, I didn't see anything. I don't remember anything. I know nothing. So the jury saw the statement, the video statement that was not under oath. They saw the grand jury testimony that was under oath. They heard the testimony that was under oath. And the jury believed that the defendant chased the victim and shot him. Why shouldn't we believe that the jury made a good decision? Because these statements, even if you take their first initial statements in grand jury, still don't, they conflict with each other. So supposedly we have two sets of shots fired, not supported by physical evidence, according to Ms. Daly. We have Ms. Chalmers who calls 911 immediately after this happened and says, it's too dark. I can't see. When she's asked by dispatch, do you see the color of the jacket? And she says, no, ma'am. So all of what you're saying was before the jury and they heard the testimony, and she said that she was nervous and so forth at that time. That was all discussed before, the jury heard all this. But you're telling us, what is it that should give us, I mean, you're asking us to reverse a jury verdict here and insufficient evidence. What is it that was a different way? But that's not the issue. I think it's not just that it could go a different way, but you have no physical evidence, three conflicting statements. And also the statements that at some point maybe sort of lined up where these people said that they saw Mr. Lawrence chasing Mr. Williams. Mr. Williams is shot in the front. He's shot in the chest and the hip. And the course of the wound is from front to back. So how this jury came to the decision that Mr. Lawrence chasing Mr. Williams, if that maybe occurred, then how could he be the shooter of Mr. Williams? And to say that, oh, he was zigzagging that would cause him to turn to the If you're chasing somebody, presumably the person is running forward and his back is to you. So I get that. But you could turn around. I mean, what I'm saying is, I mean, we don't know. Somebody could turn around. Yeah, right. We see that we had his back to him. It doesn't mean you don't turn around. I can't imagine someone being chased by someone allegedly with a firearm, whatever turned towards that. I don't think that's even I don't think we know. I mean, I think you can say that, but there's no, there's no evidence that we have the evidence that jury heard the counter argument you're making. Again, you know, what is it? You would have found a different way. But we have you say, okay, there's no physical evidence. Well, that's not enough, you know, that the three witnesses may not all be everything they said. Consistent happens all the time, right? So that that's not a basis to reverse just that alone. I think and not just some minor inconsistencies. These are major inconsistencies, and they don't what's the one that you say that really should turn this case around? Well, I think I'm not trying to put words in your mouth. I understand. I believe that the very first thing is that when this just happens, a person that has viewed what happened, says that it is too dark. She can't see. She says yes, the victim got in a gray vehicle when dispatch asks her and I would submit that she's the state star witness at this trial, but she couldn't see it was too dark. She's looking through trees to see this. She can't tell a color of a jacket. And then 15 months later, she identifies Mr. Lawrence as according to this, what she signed the photo array, the person with the red jacket attempting to shoot the victim. And then she says at trial, oh, he must have misunderstood. But Detective Almazan says, Oh, no, she said right after that she misremembered and now she remembers that Mr. Lawrence was actually the person in the with respect to your other arguments. This is all evidence that was before the jury and they made the judgment call. They determined from the verdict, we can assume that she was credible. And how can we say sitting here, not having been at the trial that she's not, that's not our job. I, you know, I do understand that, you know, great deference is given to the jurors decision in weighing the credibility of the witnesses. However, there are times when, as the courts have reasonable people make unreasonable decisions. And there's one of two things that happened here. Either that occurred or the statements made by the prosecutor during his rebuttal closing argument are why we're here. And I think that those statements that were made, and this is near the end of his rebuttal closing argument. It's one of the last things the jurors hear. They're told when you go back in that jury room to delivering, you will be the voice of victim. The person that they just heard about had been shot and killed and died. And now they're the voice of that person. This is a completely improper statement. And we timely objected to that. And the court overruled that objection, allowed the state to finish what his statement was. And this is near the end, allows him to finish. And then the court realizes apparently that that was an improper statement. It should have been sustained. And he says, I'm going to sustain that objection. And he instructs the jurors this. The jury's instructed they are not to place themselves in the position of any party in the case. A party in the case? That's not Corey Williams. That's not the victim. He's not a party to the case. It doesn't explain to the jurors what they're to disregard, what they're not to do. It's this very vague instruction that doesn't cure the error. And I would submit that the damage is already done when they're told that they're the voice of the victim. Can I interrupt? What case are you relying on? What is your best case when you argue to us that that was error? Well, I would say that it's tough because there's not a case that says exactly the same thing, that you're the voice of the victim. There's similar things. There's cases such as Wheeler in which the prosecutor says that he's the only voice of the victim. And those were statements that were considered by the court to improper. That was along with other statements as well. There's other cases where the jurors are told to place themselves in the shoes of the victim. But I would submit that this is worse than that. So to say... But again, my question is, what case are you relying on that you are arguing to us best supports your position that this was an erroneous argument? I would say that the support regarding that these are inappropriate statements to be made, it is different, but I would say that's probably our best support. And when statements are made that are telling you that someone else is to be the voice of the victim and evokes their emotions and their passions, that is giving them an improper job to do. And I'd say that there's multiple cases that say that if it's immediately objected to and sustained, that maybe it could cure that error. And that's not the case here. And why do you say that that's not the case? Because from reading the transcript, it was in the next paragraph of the transcript. I would say because this has been said to the jurors and he lets the prosecutor finish his argument, I'm sorry, his statement. And then what he says doesn't actually instruct the jurors properly to say that they're not to place themselves in the position of any party. It doesn't explain what he's talking about, what objection he's sustaining, or even what he's referring to that's improper that they should disregard. Plus saying you are the voice of Corey Williams is something that you cannot take out of your mind to tell the jurors that they're the voice of the person that they just heard about that died. Now they're thinking of something that is different than only look at the evidence here. You're, you know, unbiased, review the evidence and make your decision. No, it is, you're the voice of the person that died. And there is a case, there is a case that you don't say from the first district, people versus pot, which is 2021-161-219, 161-219. And that case, I'm just reading from paragraph 294. By this, he means, that's referring to defendant, that the prosecutor invited the jury to speak for the victim. The name is there, I'm just saying the victim so you know who it is. To be the voice of the victim and to tell defendant on her behalf that the lies are over, the manipulations are over, the deceit is over, the games are over. You can no longer outrun the evidence in this case. And then it goes on to say, a prosecutor may urge a jury to administer justice and may phrase the call for justice as an invocation from the victim. And they concluded this paragraph by stating, that is all the prosecutor did here, if in somewhat metaphorical language. Defendant has not shown that the prosecutors committed misconduct of any kind. So there's a case, I guess, that wasn't cited. And I want to bring that to your attention, that uses the words that you're talking about here. The case after this incident, but it's very reminiscent of what happened in this case. And in that case, the panel did not find it a problem. I just wanted to bring that to your attention. I would say that, first of all, I believe that it is improper to say that, that that decision, I don't believe is correct to say that it's okay to say that you're the voice of the person. To put that onto the jurors, that that should not have been found to be okay. And when you're talking about that, it was phrased a little bit different to tell the defendant this or something of that nature is different than telling them when you go back and you deliberate, you're the voice of the victim. I think that that is completely improper. The court realized that it was improper and then attempted to sustain that objection. But to talk about that you're the voice of the victim to a jury where there is, as I've laid out, no physical evidence conflicting eyewitness testimony. And now you have this statement to them at the very end, it is not, the judge does not then correct that properly, doesn't tell them to disregard this statement, that that is then why we have that Mr. Lawrence was found guilty. I just wanted to go back to a couple of questions about the facts. The lady behind the window, lady who was talking about what she saw through the window, Crystal Chalmers testified that she heard someone begging for their life. She looked out the window and saw Williams lying on his stomach near the open car door. He got off the ground, he ran, blah, blah, blah. And then she heard another, the defendant, told the man searching the car that he got him. So I was just curious. This all happened on February 15th in 2014. And according to public information, the temperature on February 15th, 2014, is that the right date I've got? February 5th on 2014, the high after at around 6 p.m. was 18 degrees. So it's unlikely that she had her windows open. She doesn't testify that her window was open. She said she saw through her windows. So I'm trying to figure out how she heard any of this. And she never saw, she didn't testify that she did testify that she saw the defendant chase after someone. But she didn't testify that she saw a defendant shoot anybody. So I'm just, I mean, the state keeps talking about how there are three terrific witnesses. I'm thinking Crystal Chalmers is maybe not so great. The other two witnesses kept changing their stories, but I'm particularly concerned about their actual testimony that they were threatened by the police. Now this was in court, was it under oath, and they testified that they were threatened by the police. This is 2014. It's not entirely hard to imagine that this happened. And I just wonder, you've got, if you eliminate Crystal Chalmers, other than seeing something and just say, okay, she never testified, she testified she heard something, but she never testified she opened her window. The other two witnesses are so inconsistent. I don't see how the state has really proven its case here. Now, of course, it was arrested a year later. So there's not going to be any gunshot residue test that's going to work. There's, they never found a gun. The video surveillance camera, the defendant's not even on that video surveillance camera, right? No, he's not. No. So I'm just having a little problem with the facts here. And I just be anxious to hear what the state has to say about it. But you've already told us that the three witnesses were inconsistent. And that because of this inconsistency was not proven guilty beyond a reasonable doubt, the state has taken a different position. So when you get right down to it, you're tying that together with the state's statement at the end, that they should, the jury should be the voice of the victim. And the voice of the victim would be, hey, this guy shot me, you know, don't let them get away with it. But there's, these witnesses are so inconsistent. The trial testimony was, I didn't see anything. I didn't hear anything. I don't know anything. So, except that the police threatened me. And they were consistent about that. So I'm having a problem with trying to figure out how we, why we shouldn't just rely on the jury. Jury heard all this. Yes. And I believe that, you know, it's, that that statement at the end could, by the prosecutor could have been what then brings us to having a conviction and finding him guilty when there, there isn't, there isn't anything there. So even if you were to take the statements that were made, not at trial and put them together, none of them line up, none of them make sense amongst each other. And these aren't minor discrepancies. So no matter how you look at it, even if you look at each of their best statements, they don't line up with each other. They don't make sense. And there are not enough to have found Mr. Lawrence guilty beyond a reasonable doubt. And then you have the, what I submit is improper statement to tell the jurors, they are the voice of the victim when they go back and deliberate. And for those reasons, I am asking that you outright reverse the conviction or at minimum reverse and remand for a new trial. Now, I do have one other question. So he was on parole for armed robbery during the commission of this crime. And the trial judge took that into account that he was on parole, that he should have learned his lesson. He'd been in prison for something that involved armed robbery. I'm assuming that meant a gun, but it could have, I guess it could have been a dangerous weapon, but we'll say it was a gun. And that there's nothing improper about that, is there? I don't know that it's improper to consider that. I think it's a matter of considering that how much weight is given to it and also considering the mitigation and the way that the judge went through all of the factors. It seemed as though no consideration was given to the mitigation when you have 50 years plus 50, a total of a hundred when the minimum is 45. I didn't see, I see in the attached to the briefs, the letters of the family members of the defendant. I don't recall that the judge took that into consideration. He said on the record that he would put them together as an exhibit. And while we were, unfortunately in the trial file, not all of those were contained within the court file, but we were able to obtain some of the letters, at least that had been tendered to the court and supplement our record with it. But he doesn't seem to note them other than to say that he was going to mark them as, I believe defense sentencing exhibit one, something like that. He did say he considered everything in mitigation. So because it was a trial judge, we have to assume that he considered these letters. I would say that the hundred year sentence tells us otherwise. However, but yes, he did say that he was admitting those letters, even if he didn't refer to them. He did have a couple of questions. How old was Mr. Lawrence when he was charged with those prior offenses? At the time when he was, I'm sorry, at the time when he was charged with the previous. Yeah. So for example, the first offense was in 07, I believe, and he was 23 in 2015, I believe is what it says. So that means he was under 18, he was around 16 or 17 at the time. I apologize. I don't know for sure. I would just, I would need a moment to look at his date of birth to just confirm. I don't want to speak. Right. But it seemed to me that he was a minor at the time. And then there was another offense a couple of years later where he went to boot camp, I think. And again, I think he was 17, 18. If I'm, I think I'm right on that, but maybe a constable state's attorney can confirm if I'm right or wrong. But with regard to the enhancement, the judge states that the sentence is absolutely necessary to deter others from committing the crime. Let me start with that sentence. What is your take on comments like that? Well, I would say that we have had the firearm enhancements now for many years, and there hasn't, there doesn't seem to have been any decrease in crimes being committed with a firearm. So the deterrent is, it just isn't the case. And we've seen that in the past, it doesn't serve as a deterrent. So the judge gave a double, no, the minimum is 25. He doubled it. How does the court then determine whether the judge abused his discretion? How do we make that determination in this situation? What should we consider and what kind of guidance are we giving other judges? I would say that it's important to consider not just the background and possible prior offenses, but also to look at giving a sentence of 50 years for the charge of first degree murder. And then the same, which as your honor stated is double what the enhancement is. We're now at, he's getting the same for an enhancement as for the charge of first degree murder. And we're getting to a total of a hundred years, which is certainly a de facto life sentence. But I think that it needs to be that the court has to have everything be considered. And it seems as though the mitigation, even though he says it's considered, doesn't seem that the 50 years for first degree murder, and then another 50 years for a firearm enhancement, personally discharged, which approximately caused the death. And so I think that that is, that is not reasonable. And that was not an appropriate sentence. He was 23 at the time of this trial or at the, at the, when he, when the shooting occurred, I believe he was 23 when he was arrested. So he would have maybe been 22 at the time. I'd have to look at his data to give the exact. Back in 2014, nobody was making any arguments about emerging adults. Is that a correct statement? That's correct. We hadn't, I don't believe that the courts in Illinois had started to had not changed yet regarding you look at whether or not a defendant was under the age of 21 for that mandatory sent the mandatory class X sentencing. None of that was in place. Yeah, but you didn't make the argument about emerging adults in your brief. Is that a correct statement? Yes, that's correct. Okay. Any other questions? Okay. Your rebuttal time. We'll honor that. Thank you, your honors. Good afternoon council and may it please the court. Again, my name is David Greenspan and I am representing the people of the state of Illinois in this matter. I suppose I'll address the issues in the same order that council did. If that's the court's preference, if the court wishes me to address any issues out of order, feel free to make that known. To begin with the evidence of guilt in this case was overwhelming. The people submit that even one overwhelming. So why, what's overwhelming about the evidence when we, you heard the discussion. It sounds like there's no physical evidence. There's one woman looking through a window at night and so forth and so on. And everything that happened with those other two witnesses, that's what we have. How does that equate with overwhelming? I mean, I can understand there's evidence, but you're saying now it's overwhelming. Convince us that it's overwhelming. Well, your honor, two things I would like to address up front. You mentioned the third party witness and the window, which we do not know whether it was open or closed. And I want to just be very clear. We don't have any evidence before this court regarding the status of the double pain. And I don't care to speculate, nor should this court speculate about this window. So putting that aside, what we have is we have three witnesses that all corroborate each other's version of events. They may not be perfect, but they definitely align. You have two witnesses who knew the defendant personally, who saw him and other gentlemen pull the victim out of his car, uh, beat him up. And then this man managed to escape and it was only the defendant that chased after the victim. The others did not chase the V the defendant in this case is the only person seeing in pursuit of the victim. And he's the only person seeing returning after the shooting. All three of the witnesses testified consistent with that premise. Now is true that the witness testimony in this case is not consistent. However, inconsistency is not enough on its face to overturn the jury's verdict. The jury is allowed to draw whatever reasonable inferences that it may from the evidence that it had. And the question had to do with overwhelming. You said, you know, it was a difference. I mean, it may not be overwhelming, but there's evidence. And I, that's the argument I hear you say, but I, my question was, tell me why in this case, this evidence that you just discussed you, your first statement was it's overwhelming. And that's where I'm trying to get at. Yeah. But what's overwhelming about you just, it seems to me that you just, you just discussed this. It's not overwhelming. It's there. There's some issues with the evidence for sure. Whether or not we agree on the overwhelming status of the evidence, I think it bears repeating that there is still enough evidence here to sustain a conviction, even one credible witness. And aside from the inconsistencies in the testimony, defendant is not pointing to any specific thing as to why these witnesses are in any way, not credible. Ultimately, it's the jury's job to determine credibility. And clearly the jury found that these witnesses were credible in some way. We don't have any way of knowing to what extent they placed weight behind which witness. But what we do know is we have three witnesses, not one, not two. We have three witnesses that all corroborate one another. Yes, their testimony wasn't perfect, but perfect testimony is not required to sustain a conviction, nor is physical evidence just because there was no physical evidence in this case that does not undermine the integrity of this conviction. One bit circumstantial evidence is every bit as potent and viable as physical evidence. And the with which to make a decision. Ultimately, their decision must be viewed under the standards of Jackson versus Virginia. That's what we're talking about here. So we have to look at the evidence, no matter whether we agree with it or not, and the various interpretations that are being floated here. But that's another thing that this court should take notice of is that what defendant is effectively arguing here is a different interpretation of the evidence. And that is not enough standing alone to overturn the jury. The fact that there is multiple interpretations doesn't actually matter to this analysis. The jury made their decision based on the evidence that was before them. And unless the defendant can show that their decision was so far outside of the scope of rationality that it can't possibly be seen as trustworthy. The only alluded to so far. For me, just said in multiple interpretations does not equate to overwhelming. You say there's evidence here and we shouldn't. The jury made the decision based on evidence. Again, my first point was this overwhelming thing. And I don't hear you speaking about overwhelming. Now I hear you saying something different. But I understand the argument you're making, and it's a valid argument, but it's different than saying that the evidence is overwhelming. And that's I just wanted to confirm. So if I may clarify, then your honor, it is the people's position that the evidence in this case was in fact overwhelming. However, to the extent that the court disagrees, it is our position that there was still more than sufficient evidence to sustain this conviction. And defendant has not pointed to anything in the record that would undermine the integrity of the jury's verdict. What about the testimony of two of the witnesses that the police threatened to take away their children and fed them the story? The jury had that evidence before them and chose not to believe it. And there's nothing in the record that suggests that the jury's decision was in any way improper. Witnesses change their testimony all the time, your honor. Unfortunately, this is a reality of criminal prosecutions. I would also remind this court that those same two witnesses also consistently testified throughout the various stages of proceeding, that they felt that their personal safety and the safety of their families was also threatened by defendant and his compatriots. So you can take both of those statements in context, which is exactly what the jury was asked to do here and come to your own conclusion. But ultimately, the jury decided that the and again, there was nothing on the record that would overturn that decision. Mr. Greenspan, how do you respond to counsel's argument about the prosecutor's closing argument? Thank you, Justice. I was just getting to that. Regarding the closing arguments, the people submit that this was not an improper statement in any way. As Justice Hyman pointed out, there was the recent case in 2021 where a very similar statement was made, and that was ruled not to be misconduct. And in fact, the prosecutor is allowed, as the justice did point out, to urge the jury to do the right thing or to err on the side of justice. That has never been ruled improper before. Furthermore, this particular comment was an isolated comment, as counsel mentioned during her argument. It came towards the end of rebuttal. It was a one-time remark. And even though the prosecutor was allowed to finish their statement, as they said, the trial court in its decision that the statement was improper, which again, the people would submit that we disagree with the trial court's assessment in that regard. However, to the extent that the a curative instruction was offered almost immediately, that plus the jury also had the full instructions in front of them, which gave them very clear instructions that they were not to try and put themselves in anyone's shoes, nor were they to allow emotion or anything other than the evidence before them to sway their decision, as well as the fact that any statements by the to be an error. We believe that it was not error, but to the extent that it was, it was harmless and it was cured almost immediately by the court. Finally, unless there are any questions, I'll just briefly address the sentencing issue for the court here. This sentence, while definitely a large sentence, nobody's going to it was still completely within the court's discretion. The trial court did not go anywhere outside the statutory range. A lot of argument was made regarding the firearm enhancement and how the 50 years imposed by the trial court was double the enhancement. That is an incorrect argument. Double the enhancement would be a double life sentence because the enhancement in this, let's say double the minimum. It's double the minimum, right? You add the 50 and the 50 of a life sentence. It's natural life. However, you can make that argument, but it's kind of facious because the minimum is 25. The minimum is in fact 25, but the maximum is natural life. The court had discretion. When is 25? I mean, there's a minimum for a reason and a maximum for a reason. There's a middle ground too. When you get 50 years, you're usually talking about somebody for most of their life because if he's 23, you're talking 73, so at a minimum. Even then, it's most of his life. It's all except his older age. What factors should a we're looking at this? Sure, everything's in the range between 25 and life that they can come up with. That doesn't mean every enhancement is permissible. It could be discretionary, but there still can be an abuse of discretion. The question still becomes how do we make that determination? It isn't that this appellate court has no ability whatsoever to review this. Nobody has ever ruled that, and so that's not going to fly. The question still is how do we determine when an enhancement has exceeded what is reasonable and has abuse of discretion? How would you say that we should consider that? First, Your Honor, to clarify, I just want to it's abundantly clear that the people's position is not that the sentence is not reviewable. We 100% agree with this court that it has the jurisdiction and the authority to review the trial court sentence. However, case law jurisprudence says that when reviewing a trial court sentence, the extreme caution must be taken because, again, you are being asked to override the discretion of the trial court. It is the trial court's duty to take all of the evidence that is in front of it at sentencing and to come up with a sentence that it deems to be appropriate because this court does not have the benefit of live testimony and does not have the benefit of having experienced the trial firsthand, does not have the benefit of all of the evidence, all of the objections, all of the arguments that preceded that. This court simply has the record. And so a certain degree of deference is required. But Your Honor is correct. We have to look at this from an abuse of discretion standard. And here, defendant has not identified what way the court abused its discretion. The sentence, while 50 years is larger than the minimum that the court could have imposed for this firearm enhancement, it is nowhere close to the maximum. The maximum is natural life, unequivocal. I don't think that's the issue. But you do make a good point that what your point is, we'll find out in the rebuttal, but I've read their reply brief and their opening brief. But what is it that they're saying with regard to that enhancement, specifically saying to show that that was overboard, that that was an abuse of discretion? So your position is, well, they didn't make that argument. Am I trying? I'm not trying to summarize what you just said. No, Your Honor. And if I could just address that point very briefly, and I still haven't fully answered your question. So I'd like to fully answer your question, if I may. But first, I want to answer this inquiry regarding the defense position on this. I want to talk about a statement that was made in the argument here that the enhancement that firearm enhancement does not appear to have any deterrent effect. Then I posit to this court, why have the deterrent? Or why have this enhancement at all? Ultimately, it's not this court's job to decide whether or not the enhancement itself is appropriate. That's for the General Assembly. This court only needs to decide whether or not the imposition of 50 years within discretionary range of 25 to life is an abuse of the trial court's discretion. Now, to get to that point, the trial court is allowed to consider a very broad range of evidence and factors when determining what an appropriate sentence is. And case law in Illinois is abundantly clear that the most important factors that the court should look at in sentence, aside from the provisions of the Illinois Constitution. And of course, we all wish that it was possible that people could be sentenced in a way that was consistent in restoring them to useful citizenship. Nobody here is going to claim that the proportionate penalty clause is wrong. However, certain cases, certain circumstances warrant extreme sentences. And we have to look at the seriousness of the offense itself. And that is what the trial court focused on here, the seriousness of the offense itself. The trial court essentially characterized this as an execution, not necessarily just a murder, but an execution. And the evidence in the case, whether we agree on one interpretation or the other, suggests that this defendant hunted down a defenseless individual and shot them in cold blood while they were pleading for their life. That is an extremely egregious offense in anybody's eyes. That is not something that would shock the moral conscience of the community if they found out that the court imposed a natural life sentence against an individual with an extensive criminal background who goes out and executes an innocent defensive person in cold blood. So to answer the court's question, defendant hasn't pointed to any particular factor that the trial court either weighed improperly or failed to consider. And for those reasons, there is simply not enough here to override the trial court's reasoned discretion. And we would ask the court to affirm the defendant's conviction for first-degree murder and the defendant's hundred-year sentence. Thank you. Any questions? No, thank you. Ms. Mazzarella? Thank you. I did, just to let the court know, I did look at Mr. Lawrence's birth date. It was August 9th, or it is August 9th of 1990. He would have been 23 years old at the time of the incident, 24 at the time of his arrest. He was either 18 or 19, I'm sorry, 18 for his gun case and 19 at the time of the armed robbery. So he was in his teens for those first two cases, but not below the age 18, from what I can tell. It was the armed robbery for which he was on parole. Yes, and that was from 2009. He was on parole from 2014, 15, 14? I'm sorry, the case was in 2009. The shooting was in February of 2014. So he was on parole from 2009 to 2014? No, I'm sorry, he was charged in 2009 and then later sentenced, and then he was on parole in 2014. Any other questions? Do you have anything else, Ms. Mazzarella? I'm sorry, I did just a couple of things that I wanted to touch on. That the state talked about that just even one credible witness, it can be sufficient for a conviction beyond a reasonable doubt, and that's correct, but there were no credible witnesses here. They all conflicted themselves, each and every witness did. There wasn't anyone that viewed the shooting. So I would say that there's no one credible and no eyewitness. And I don't believe any of the witnesses said that in regards to pleading for his life, that was an allegation that involved not Mr. Lawrence, but I believe Daryl Wilson, when that occurred, that supposedly Mr. Williams was pleading for his life at the time when she heard this, Ms. Chalmers heard this, and looked out her window. So that wouldn't have been attributable to anything having to do with Mr. Lawrence. Was that when he was being dragged out of the car that he was saying, he was being pulled out of the car? I thought that he was saying, don't kill me, you know, when he was being pulled out of the car. I believe that's correct, and apparently Mr. Lawrence was tagged down there if that was to be believed that he was there. So he's talking to two other people, not the dependent when he said that. According to the statements of the witnesses at some point, yes. I believe that's all I wanted to respond with. I would just say about the argument made that with regard to the enhancement and your response to whether the enhancement was an abuse of discretion or not. Is there a response in the briefs? I would just say that it's not proportionate, and that is our argument. And to double the minimum enhancement of 25 years, which is the same as the sentence that was given for the first degree murder, that shows us that that's not appropriate. That's an abuse of discretion. And it is hard to tell what weight was given by the judge. He quickly ran through all of the factors that he was to look at. He states that he did mark the mitigation, but it doesn't appear from his sentence that he gives that that is what he did, that he did actually take those things all into account based on the 100-year sentence. Okay. Any other questions? All right. Then Ms. Massarello, Mr. Green's family, I'd like to thank you both for your consideration. We'll enter an order, an opinion forthwith. And because of that, this court is now adjourned. Thank you.